Filed 6/14/22  P. v. Brooks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> AKILAH ASHA BROOKS, <br><br> Defendant and Appellant. | F079503 <br><br> (Madera Super. Ct. No. MCR043023) <br><br><br> **OPINION** |

### THE COURT*

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Linda J. Zachritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

* Before Smith, Acting P. J., Snauffer, J. and De Santos, J.

## INTRODUCTION

Appellant Akilah Asha Brooks was charged with a felony offense and found not guilty by reason of insanity in 2012. She was subsequently released on outpatient status. In this matter, she filed a petition for restoration of sanity pursuant to Penal Code[1] section 1026.2. After an evidentiary hearing, the court denied the petition. On appeal, her appellate counsel has filed a brief pursuant to the opinion of the California Supreme Court in *Conservatorship of Ben C.* (2007) 40 Cal.4th 529. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On or about October 27, 2011, appellant was an inmate at Valley State Prison for Women and a participant in mental health services.[2] A correctional officer saw an object fall from appellant's waistline and seized the item. The object was a lock placed inside of a sock, something commonly used as a weapon inside the prison.[3]

**Insanity Finding and Commitment**

On October 10, 2012, a first amended information was filed in the Superior Court of Madera County charging appellant with count 1, unlawful possession of a weapon, "a lock in a sock," while confined in a penal institution (§ 4502, subd. (a)) with one prior strike conviction and one prior prison term enhancement (§ 667.5, subd. (b)). Appellant

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] The facts for appellant's underlying conviction are from the preliminary hearing.

[3] As will be explained below, appellant filed a petition in 2019 for restoration of competency, CONREP prepared a report for the hearing, and the court considered that report in denying the petition. According to CONREP's report, appellant "was initially arrested in 1996 at the age of 20 for Possession of a Controlled Substance. Since then, she has been convicted numerous times for theft, prostitution, possession of illegal substances, probation violations, battery, obstructing a peace officer, battery resulting in serious bodily injury, and multiple failures to appear violations. [Appellant] was originally sentenced to [Valley State Prison for Women] after being convicted of stealing a car. Although she did not engage in any violence during the commission of the car theft, she did get into an accident in the car, resulting in a violence enhancement during sentencing."

2.

pleaded not guilty and not guilty by reason of insanity, and the court appointed experts to examine her.

On November 9, 2012, appellant waived her right to a jury trial and submitted the matter on the experts' reports. The parties stipulated that a "lock in a sock" was a weapon. After reviewing the evidence, the court found appellant was guilty of count 1, the prior conviction allegations were true, and also found she was not guilty by reason of insanity. The court referred appellant to the Conditional Release Program (CONREP) for an evaluation and recommendation.

On December 6, 2012, the court committed appellant to Patton State Hospital.

**Outpatient Transfer**

On February 9, 2016, the court approved appellant's transfer to outpatient treatment and supervision by CONREP. On March 9, 2016, appellant was released to community outpatient treatment.

On February 8, and July 30, 2018, the court reviewed CONREP's reports and found appellant continued to have a severe mental illness that was not in remission; she was a danger to others if not under continued care; and ordered appellant to continue in the supervised released program.

**APPELLANT'S PETITION FOR RESTORATION OF SANITY**

On March 19, 2019, appellant filed a petition for restoration of sanity and unconditional release from CONREP pursuant to section 1026.2, because she had received the full benefit of treatment and was no longer a danger to the community. She requested an evidentiary hearing.

**CONREP's 2019 Report**

On February 5, 2019, CONREP submitted a status report about appellant's condition for an upcoming review hearing. This report was introduced into evidence and considered by the court at the hearing on her petition for restoration of competency.

At the time of the report, appellant was 42 years old and fully oriented. She was diagnosed with bipolar disorder, in partial remission; cocaine use disorder, severe, in sustained remission; and cannabis use disorder, severe, in sustained remission; and was prescribed psychotropic medication.

Appellant received treatment from CONREP "at the Transitional Level of Care," that was appropriate for patients who have progressed through other Community Outpatient Treatment levels and are being considered for progression to Aftercare Level." Appellant received one individual therapy session and one group therapy session every month. She met with CONREP's psychiatrist three times a year and submitted a drug test at least once a month.

Appellant lived on her own in an independent living apartment, she was responsible for fulfilling the responsibilities of daily living, and she received at least one home visit from CONREP per month.

> "Unfortunately, [appellant] has maintained a negative attitude toward CONREP and CONREP staff, which has on several occasions overshadowed her progress. [Appellant] made racially insensitive comments toward African-American staff in the office and when addressed she attempted to make it [in] a joking manner but later stated, 'Well maybe it's true.' This behavior demonstrates that she continues to struggle with her impulsivity and has not learned to think before making inappropriate statements. Additionally, [appellant] continues to blame CONREP for her placement into the program versus accepting accountability for her actions and criminal behavior/thinking. Due to her continuous blaming of CONREP, [appellant] demeanor and response toward staff is generally hostile and inappropriate. Her inability to distinguish between appropriate joking behavior, impulsive responses, and accountability is of concern as her risk of re-offending and/or being positioned in an unfavorable situation would likely increase if she were not being monitored by CONREP. Unfortunately, whenever [appellant] makes a poor decision or behaves in an unpleasant manner, she blames someone else for her behavior and/or minimizes her behavior, which displays her continued criminal thinking.
>
> "… [Appellant] was attending Fresno City [College], however she made the decision to drop out of school without informing her treatment team. When she was questioned about her attendance[,] she gave dishonest

4.

answers until the truth was revealed in reviewing her classwork via Canvas (online school resource). Her inability to be truthful regarding her struggles with basic life situations is of concern, as she attempted to hide her lack of school attendance, which demonstrates deceitful behavior. Fortunately, [appellant] did re-enroll in classes at Fresno Adult School and Fresno City College, in order to work toward her GED and potentially receiving a certificate in Drug and Alcohol Counseling in the future. Recently, [appellant] complained about her schedule and being too busy. However, when it was suggested that she re-evaluate her school [schedule] and maybe decrease her classes as it was her choice to create a full schedule, (again) she attempted to blame others and stated 'that she did not have a' choice. [Appellant] often has distorted thoughts regarding what is expected of her and attempts to use others as a scapegoat for her decisions. *Unfortunately, her distorted reality has caused her to engage in criminal activities in the past and if she is unable to re-evaluate her thinking and improve her thought process to a more reality based approach, it is likely that she will remain at risk for decompensation if she is not receiving treatment from CONREP.*

"With regard to her substance abuse history and treatment, [appellant] continues to minimize her substance abuse history and need for treatment. Recently, she began taking drug and alcohol courses, in which she advocated that she should not be required to go to AA/NA meetings due to taking the courses. It was explained to [appellant] that going to school to provide treatment and receiving treatment were two different objectives and that it is unethical to attempt to provide treatment to yourself. Examples were provided to [appellant], such as a doctor treating himself or a therapist trying to provide therapy to his/herself. The importance of an addict maintaining treatment for an addiction was addressed, in which [appellant] continued to minimize her need for treatment and state her lack of 'desire' to use. Additionally, she does not believe she is in need of a sponsor and does not have regular communication with her sponsor as suggested for treatment. *It is of grave concern, that [appellant] is unable to understand the importance of receiving ongoing treatment for [a] disease/addiction and her only relapse prevention plan is 'I have no desire to use.' [Appellant] has openly stated upon restoration of sanity that she would no longer attend AA/NA meetings for substance abuse treatment as she feels her classes are adequate. If she were to be restored to sanity, it is likely that she would no longer focus on her addiction and lose all supports and resources for her substance abuse, which could increase her chances to relapse.*

"Throughout this past year, [appellant] has added and subtracted prosocial supports from her collateral contacts. Unfortunately, she has not

presented any sustainable peers/supports to CONREP.  Her primary support system is her mother, who resides in the Sacramento area.  Having no support system in her place of residency outside of CONREP is concerning, as she wishes to be restored to sanity.  It is important for [appellant] to establish a consistent foundation of support in the community, in order to engage in prosocial interaction and communication on a regular basis, as well as, to assist her if she starts to experience any symptoms of her mental illness.  She continues to minimize her mental illness and her need for support, which is bothersome to her treatment.  *If she is unable to acknowledge her need for treatment and support, it is likely that she would isolate and potentially experience an exacerbation of symptoms if she were not in CONREP*.  Therefore, her treatment will continue to focus. on developing prosocial communication skills, problem-solving skills, and crisis management skills, in order to continue to reduce her need for supervision from CONREP."  (Italics added.)

The report concluded that appellant had "a severe mental illness that is not in remission and presents risk factors that make her a danger to the health and safety of others if she did not remain under CONREP's supervision.  While she continued to make progress, her struggles "with impulsivity, irrational decision-making, distorted thoughts, lack of communication, lack of community supports, and minimization of substance abuse and mental illness continue to keep her at risk of decompensating and becoming a liability to the community," and she had not created a relapse prevention plan to support her expressed commitment to remain clean and sober.

**Dr. French's Report**

On May 24, 2019, Dr. Jonathan French, a clinical psychologist, filed a report with the court for consideration at the hearing on appellant's petition for restoration of competency.  He generally agreed with CONREP's conclusions and found appellant did not have an adequate grasp of how to manage her mental health and risk for decompensation; she was fragile and did not maintain adequate self-control; and she still needed CONREP's support.

**Evidentiary Hearing**

On May 24, 2019, appellant waived a jury trial.  On May 29, 2019, the court conducted an evidentiary hearing on appellant's petition.  The district attorney introduced

into evidence CONREP's February 5, 2019, report, and Dr. French's psychological evaluation of May 24, 2019, without objection.

Appellant was the only hearing witness. She testified that she was doing very well, she had lived alone in her own apartment in Fresno for the past two years, she initially volunteered at a thrift shop, and now she attended school. Her goal was to earn a drug and alcohol counseling certificate and become a counselor to help other people.

Appellant regularly took her prescribed medication and believed they helped her. She did not take some medications during a limited period in the prior few months, when her doctor suggesting eliminating one of them. Appellant testified she adjusted her medications on her own to try to determine which one she would feel comfortable doing without. She eventually returned to her regular regimen, which she felt worked well. Appellant testified that her only relapse occurred for one day when she "smoke[d] a little weed."

Appellant knew CONREP wanted her to have a support system of people in Fresno, but she considered this unrealistic because she was originally from Sacramento and most of her family lived in Sacramento. She considered her family as her collateral support system, and she wanted to visit her mother and family there.

Appellant testified she got along with her landlord and college professors. She did not understand why CONREP had "issues" with her. She was nice to CONREP's staff, although appellant and her clinician "bump heads sometimes." She did not feel that she was a threat to herself or anyone, and she felt like she had "done more than enough, and proved beyond and above" to be released.

**The Court's Ruling**

The court stated it had considered appellant's testimony and the documentary exhibits, complimented appellant for her progress, but was concerned about certain issues.

7.

"I understand that [appellant] has been sober for eight years, but I think she minimizes the use of the marijuana and what that can do to her sobriety. She said on the witness stand it was just marijuana. [Appellant] is in a very fragile state when it comes to the use of any type of substances that are not prescribed, given her past addiction, and I truly feel that [appellant] needs to learn more about her mental illness. It is a mental illness and when she was talking to Dr. French, she said, 'I'm not using any street drugs now. So I think I will probably do okay without the psychotropic medication,' not that she's thinking of stopping them, but the fact of the matter is that, that concerns me because I still think [appellant] feels there's a link between the two ….

"I think it's clear that … her past use of drugs has caused the mental disorder, but that mental illness is now, in and of itself, an issue, and it's going to be there regardless of whether or not she uses controlled substances or 'street drugs,' as she called them. I think she needs to recognize and understand the symptoms of that mental illness, and I think Dr. French points out a lot of the clashes with CONREP and her minimizing can be if she just can look into her mental illness and understand that maybe that's what is more of a problem than just CONREP being unwielding in their authority."

The court concluded that while appellant made progress, it agreed with the experts' reports that she needed to come up with a relapse prevention system, work on not minimizing the things that go wrong in her life and blame others, start accepting that things go wrong, and build a support system within the community beyond her family, and these things could be done with CONREP's assistance. The court declined to find by a preponderance of the evidence that she was restored to sanity and was not a danger to the community given her past offenses and mental illness.

On June 14, 2019, appellant filed a notice of appeal from the court's denial of her petition.

## DISCUSSION

As noted above, appellant's counsel has filed a *Ben C*. brief with this court. The brief also includes the declaration of appellate counsel indicating that appellant was advised she could file her own brief with this court. By letter on July 16, 2020, we invited appellant to submit additional briefing. She failed to do so.

8.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.[4]

## DISPOSITION

The judgment is affirmed.

---

[4] "A defendant who has been acquitted by reason of insanity and committed to a state hospital can obtain release upon a finding that his or her sanity has been restored" under section 1026.2's two-step process. (*People v. Endsley* (2016) 248 Cal.App.4th 110, 116; *People v. Soiu* (2003) 106 Cal.App.4th 1191, 1196.)

"The first step in the release process requires the defendant, who has filed a release application, to demonstrate at a *hearing* that he or she will not 'be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community.' [Citation.] If the court finds such at the hearing, the defendant is then placed in 'an appropriate forensic conditional release program for one year.' [Citation.] This is commonly called the outpatient placement hearing. Thus concludes the first step of the release process." (*People v. Soiu, supra*, 106 Cal.App.4th at p. 1196.)

"The second step in the section 1026.2 release process is referred to as the restoration of sanity trial, and can only be reached if the applicant has already met the threshold test for placement in 'an appropriate forensic conditional release program.' [Citations.] 'Outpatient status is a prerequisite to a finding that sanity has been restored. [Citation.]' [Citation.] At the end of one year in an outpatient program, the court 'shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder.' [Citations.] The applicant must show he or she would not be dangerous if unconditionally released. [Citation.] The applicant again has the same due process rights, including a jury trial, and the burden of proving he or she would not be dangerous by a preponderance of the evidence." (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433–1434.)

"We review the trial court's determination for an abuse of discretion, drawing every reasonable inference in favor of the trial court's determination." (*People v. Dobson, supra*, 161 Cal.App.4th at p. 1434.) Under this standard, it is not sufficient to show facts affording an opportunity for a difference of opinion; rather, abuse of discretion is shown only if the court exceeds the bounds of reason, all circumstances being considered. (*People v. Cross* (2005) 127 Cal.App.4th 63, 73.) Based on the record set forth herein, and the trial court's lengthy findings at the evidentiary hearing, the court did not abuse its discretion when it denied appellant's petition.